## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KENNETH R. SEARFOSS,** : | |
|    **Plaintiff** : | |
|    v : | **CIVIL ACTION NO. 3:13-2221** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** : : | **(JUDGE MANNION)** |
|    **Defendant** : | |

### MEMORANDUM

### 1.   Introduction

Plaintiff Kenneth R. Searfoss has filed this action pursuant to 42 U.S.C. §405(g) seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Searfoss' claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Searfoss met the insured status requirements of the Social Security Act through March 31, 2011. Tr. 23, 135.[1]

Searfoss protectively filed his application for social security disability insurance benefits on March 17, 2010, claiming that he became disabled on May 23, 2008.[2] Tr. 58, 127. Searfoss has been diagnosed with degenerative

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.
[2] Searfoss amended his alleged onset date at the administrative hearing. Tr. 58. He originally claimed an alleged onset date of June 10, 2006. Tr. 143.

1

disc and joint disease of the lumbar spine, blindness in the left eye, bilateral glaucoma, hypertension, hyperlipidemia, and insomnia. Tr. 23-24. On October 4, 2010, Searfoss' application was initially denied by the Bureau of Disability Determination. Tr. 117.

On November 19, 2010, Searfoss requested a hearing before an administrative law judge ("ALJ"). Tr. 124. The ALJ conducted a hearing on January 25, 2012, where Searfoss was represented by an attorney. Tr. 50-114. On February 7, 2012, the ALJ issued a decision denying Searfoss' application. Tr. 21-32. On July 31, 2013, the Appeals Council declined to grant review. Tr. 1. Searfoss subsequently filed a complaint before this Court on August 23, 2013, and this case became ripe for disposition on December 19, 2013, when Searfoss declined to file a reply brief. Searfoss' case will be evaluated as a whole to determine whether the ALJ's decision is supported by substantial evidence.[3] For the reasons set forth below, the decision of the Commission will be affirmed.

## 2. **Statement of Relevant Facts**

Searfoss was 46 years old at the time of the ALJ's decision, He has a tenth grade education, and is able to read, write, speak, and understand the English language. Tr. 143, 167, 169. Searfoss' past relevant work includes work as a car dealership shop foreman, which is classified as medium, skilled work, and as a backhoe loader, which is also classified as medium, skilled work. Tr. 108.

---

[3] Searfoss is proceeding in this matter pro se. Searfoss filed a response to the Commissioner's answer, but did not include a supporting brief outlining issues of appeal.

### A.    Searfoss' Vision Impairments

Searfoss lost all vision in his left eye when he was struck in that eye with an "ice ball" in February 2004. Tr. 275. On March 19, 2004, William McLaughlin, D.O. examined Searfoss and concluded that, though Searfoss had 20/20 vision in his right eye, he did not have any light perception in his left eye. Id. On March 24, 2004, an MRI was performed on Searfoss' brain. Tr. 552. The MRI findings were "compatible with a left retinal detachment with subretinal hemorrhage and vitreous hemorrhage" and a dislocation of the left eye lens. Id. Searfoss' eye impairment was accompanied by complaints of discomfort and headaches throughout 2004 and into 2006. Tr. 281, 283, 284, 287, 288. Surgery was never performed, and treatment was limited to medication in the form of eye drops. Tr. 56, 276.

On May 8, 2007, Searfoss presented to Erik Kruger, M.D. complaining of trouble urinating, and "wonder[ing] if it's related to eye-drops." Tr. 273. Dr. Kruger noted that Searfoss' "ocular exam [was] essentially stable" and opined that he "doubt[ed] that [Searfoss'] urinary symptoms are related to his drops . . ." Id. On August 8, 2008, Dr. McLaughlin noted that Searfoss was "not taking his Atropine" eye drops. Tr. 293.

On December 29, 2009, Searfoss presented to his treating physician, Salvatore Sparich, Jr., D.O. Tr. 313. Searfoss admitted that he had not "seen an eye doctor in some time and [had] not been using his eye drops." Tr. 315. Searfoss reported that he understood the risk of blindness accompanied by not using his eye drops. Id. Dr. Sparich noted that Searfoss had normal balance and a normal gait; he had no headaches and no eye pain. Tr. 314.

On January 7, 2010, Searfoss presented to Robert Kupsho, Jr., O.D.,

3

for an eye exam. Tr. 306-13. Dr. Kupsho diagnosed Searfoss with Glaucoma and noted that Searfoss had "some issues of non-compliance [with his] eye drops . . . [he] was taking 4 different drops, Alphagan P, Cosopt, Pred Forte and Atropine, but [had] not taken them for about 9 months to 1 year." Tr. 308, 311. On January 12, 2010, Jing Cheng Zhao, M.D. confirmed a diagnosis of bilateral "end stage 2 glaucoma without pain." Tr. 301. On September 8, 2011, vision in Searfoss' right eye remained 20/20, while he still had no light perception in his left eye. Tr. 593.

### B. Searfoss' Lumbar Spine Impairments

Searfoss began visiting Mark Bell, M.D. with complaints of low back pain in May 2005. Tr. 222. Searfoss continued presenting to Dr. Bell throughout 2005 and into 2006 where he received, among other treatments, caudal epidural steroid injections and bilateral lumbar facet blocks. Tr. 224-239. A February 26, 2007 MRI of Searfoss' lumbar spine revealed "mild degenerative disc disease" at the L3-4 and L4-5 vertebrae levels. Tr. 220. However, the disc heights were well maintained, and there was no evidence of any annulus tear, disc bulge, disc herniation, or spinal stenosis. Id.

On April 29, 2008, Searfoss presented to Rhonda Todd, M.D. complaining of low back pain. Tr. 349-55. Searfoss reported that Naprosyn did not help with his back pain. Tr. 349. Searfoss' lower back was tender to palpation, as were his upper sacroiliac joints. Id. Dr. Todd prescribed Amitriptyline and referred Searfoss for physical therapy. Tr. 350.

On May 1, 2008, Searfoss presented to Johnna Welch, P.T. for an initial evaluation in preparation for physical therapy. Tr. 249-58. Searfoss

reported pain in his mid to low back, ongoing "for years." A recent fall at work had exacerbated the pain. Tr. 249. Searfoss described the back pain as constant and reaching as high as ten out of ten. Id. Ms. Welch noted that Searfoss had a functional ability to ambulate and an unremarkable gait. Searfoss reported being able to stand for several hours at a time. Tr. 250.

Ms. Welch noted spasms and tightness to palpation in Searfoss' sacral spine region. Tr. 251. However, Searfoss had a negative straight leg test bilaterally, and was able to complete trunk bending, sitting, and standing with "good tolerance." Tr. 251, 253. He had good strength throughout, and the range of motion in his lower extremities was within normal limits. Tr. 252. Searfoss attended several physical therapy sessions throughout May 2008,[4] but requested discharge in June 2008 after two no-shows. Tr. 262. Ms. Welch noted that Searfoss had a "good response" to physical therapy. Tr. 267.

On June 9, 2008, Searfoss returned to Dr. Todd for a follow-up appointment. Tr. 342-49. Dr. Todd noted that Searfoss had a "home TENS unit," and his back felt better. Tr. 343. Dr. Todd opined that Searfoss was "stable with meds" and elected to continue all medications. Tr. 345. On August 15, 2008, Searfoss reported that his TENS unit "does help a lot when he uses [it.]" Tr. 338. At this appointment, Searfoss had a normal gait, but did have tenderness to palpation in the lumbar spine. Id. Dr. Todd observed that the TENS unit had "been effective in helping" relieve Searfoss' pain, and recommended continued use of the unit. Id.

---

[4] Searfoss attended physical therapy sessions on May 1, 2008, May 6, 2008, May 7, 2008, May 13, 2008, May 20, 2008, and May 23, 2008. Tr. 259, 262.

Searfoss did not complain of back pain again until October 20, 2010. Tr. 483. On that date, Searfoss complained of "chronic intermittent low back pain [with] occasional radiation" down the right leg. Id. Dr. Sparich noted that Searfoss had no headaches and no eye pain or redness. Id. Searfoss had a normal gait and his back was not tender, although it was positive for spasms on the right side. Id. Dr. Sparich prescribed Mobic for Searfoss' pain. Tr. 484.

Six months later on April 20, 2011, Searfoss returned to Dr. Sparich complaining of "continuing low back pain despite the Mobic and TENS unit." Tr. 492. Searfoss had no eye pain or redness, no headaches, and had a normal gait. Id. His back was not tender and was negative for spasms. Id. On April 22, 2011, and x-ray was conducted on Searfoss' lumbar spine. Tr. 551. This x-ray demonstrated "mild degenerative arthritic changes with early facet arthropathy to the left of the midline at [the] L4-5 and L5-S1" levels, as well as "mild discogenic narrowing [at] the L4-5 and L3-4" levels. Id.

On June 13, 2011, Searfoss reported that he was still experiencing low back pain, "but this [had] improved." Tr. 576. Searfoss "denie[d] other complaints" and had a normal gait. Id. On August 16, 2011, Searfoss complained to Dr. Sparich of occasional pain in his right thigh that had been ongoing for years. Tr. 586. Searfoss denied any other complaints, and again had a normal gait. Id.

### C. Residual Functional Capacity Assessments

On July 23, 2010, Joyce Vrabec, D.O. examined Searfoss and completed a residual functional capacity assessment. Tr. 439-46. Searfoss

drove himself to this appointment, and reported that he was seeking disability primarily due to his lumbar spine degenerative joint disease. Tr. 439. Searfoss reported that he had not needed a physician for the previous one to two years "because the pain [had] not been as bad and [was] under control with the TENS unit." Id. Dr. Vrabec noted that Searfoss had collected extended unemployment benefits since 2004. Tr. 440.

Searfoss had a "completely normal ability to ambulate, get in and out of the chair, and on and off the examination table." Id. Dr. Vrabec wrote that Searfoss had "multiple paint stains on his hands and wood chip fragments all over his shirt and his pants. [Searfoss stated] that he had been working outside yesterday and today before he came to the office." Id. Dr. Vrabec noted that Searfoss had a normal, full range of motion in his back, a negative straight leg test bilaterally, and "no tenderness or bogginess in any area of his back." Tr. 441. Dr. Vrabec opined that Searfoss' "subjective lower back pain [was] not substantiated by physical exam." Id. She further noted that, though Searfoss complained of issues with his vision, he had driven himself to the exam. Id. Dr. Vrabec opined that Searfoss had no physical limitations. Tr. 443-44.

On October 4, 2010, Feroz Sheikh, M.D. reviewed Searfoss' medical records and offered a residual functional capacity assessment. Tr. 455-61. Dr. Sheikh opined that Searfoss could occasionally lift or carry fifty pounds, and frequently lift or carry twenty-five pounds. Tr. 456. Dr. Sheikh also believed that Searfoss had limited depth perception, but otherwise no limitations were established. Tr. 457. Dr. Sheikh opined that the medical records revealed that Searfoss' "treatment has generally been successful in

controlling" his symptoms. Tr. 461.

### D.     The Administrative Hearing

On January 25, 2012, Searfoss' administrative hearing was conducted. Tr. 50-114. At the hearing, Searfoss testified that, after exerting himself for thirty to forty-five minutes, he would "start getting this pressure in [his] head . . . and [his] eye turns all red, and [he would] get headaches from it."[5] Tr. 73-74. The pressure in his head was usually a seven or eight out of ten, while his headaches reached a similar pain level. Tr. 99-100. Searfoss also stated that his back began hurting after "exerting [his] back for a period of time." Tr. 74. Searfoss rated his back pain as a five out of ten in the morning, and a seven out of ten at night. Tr. 101. Hot baths or using a TENS unit relieved the back pain. Tr. 102.

Searfoss testified that he is able to sit for thirty to forty-five minutes before he needed to change positions due to back pain. Tr. 80. He later stated that after "sitting for say three, four hours or something straight . . . by then I'm about ready to go and put the TENS unit on." Tr. 102-03. Searfoss could stand for an hour to an hour and a half before he needed to sit down. Tr. 103. Searfoss stated that the only time his back pain improved was when he "was absolutely doing nothing," or had just finished physical therapy, or when he used his TENS unit. Tr. 85.

---

[5] Searfoss testified that he had not used his prescribed eye drops for approximately two to three years. Tr. 91. He stated that he stopped because the drops interfered with his ability to use the bathroom, a problem that was later resolved through a different medication. Tr. 92-93. Searfoss later stated that he was no longer using the eye drops because his doctor told him the medication would not help, and it was increasing his heart rate. Tr. 93, 95-96.

Searfoss stated that he cared for his four year old grandniece on a full-time basis. Tr. 61-62. His wife generally cared for their grandniece, although Searfoss had to care for the child while his wife was working from 7 a.m. until 3:30 p.m. Tr. 62. Searfoss testified that all he did for his grandniece during the day was give her a bowl of cereal in the morning, a snack during the day, and "take her out in the backyard" or let her watch television all day. Tr. 62-63, 97-98. Searfoss stated that he was able to compensate for his blind left eye enough to drive, although he did not drive more than ten miles from his home. Tr. 64, 78-79. He occasionally mowed his lawn with a riding mower. Tr. 78. Searfoss was able to shop in stores for one to two hours at a time and enjoyed watching television and "looking at cars on the internet." Tr. 82.

Searfoss had run for two positions in the local municipal elections in 2009 and 2011. Tr. 67-70. He stated that he believed he could perform the work because it only involved attending one meeting per month. Tr. 68. Searfoss also admitted that he had collected unemployment at the time he stated he was disabled. Tr. 71-72.

After Searfoss testified, Karen Kane, an impartial vocational expert, was called to give testimony. Tr. 107. The ALJ asked Ms. Kane to assume a hypothetical individual with Searfoss' age, education, and work experience that could perform light work[6] but must be afforded an option to sit or stand

---

[6] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must

9

at will. Tr. 109. The individual could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but must never climb ladders, ropes, or scaffolds. Tr. 109-10. The hypothetical individual must avoid concentrated, prolonged exposure to extreme cold, dampness, and humidity. Tr. 110. Furthermore, he could not be exposed to hazards such as dangerous machinery or unprotected heights and could not drive at night. Id. The individual had limited left-eye depth perception and visual acuity, though he could adjust for these limitations by turning his head. Id.

Under this hypothetical, Ms. Kane testified that the individual would be unable to perform Searfoss' past relevant work. Id. However, the individual would be able to perform three jobs that exist in significant numbers in the national economy: an office helper, a ticket seller, or a ticket taker. Id.

### 3. Discussion

In an action under 42 U.S.C. §405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has

---

have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §416.967.

been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. §404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or

combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant. If the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

    A. Residual Functional Capacity Determination

After reviewing the evidence contained within Searfoss' medical records, the ALJ concluded that Searfoss had the residual functional capacity to perform light work with a sit/stand option. Tr. 24. The ALJ further believed that Searfoss was limited to occupations that required no more than occasional balancing, stooping, kneeling, crouching, and climbing on ramps and stairs, and could never crawl or climb on ladders, ropes, or scaffolds. Id. The ALJ concluded that Searfoss must avoid concentrated, prolonged exposure to extreme cold temperatures, dampness, or humidity. He was limited to occupations that did not require exposure to hazards such as dangerous machinery or unprotected heights, and was limited to occupations that did not require visual acuity or depth perception with the left eye, and did not require driving at night. Tr. 24-25.

The evidence contained within the administrative record support limitations the ALJ's residual functional capacity determination. Significantly, only two doctors of record offered residual functional capacity assessment,

both doctors believed that Searfoss was less limited than the ALJ found him to be. Tr. 439-46, 455-61. Dr. Vrabec believed that Searfoss was not limited in any way. Tr. 443-44. Dr. Sheikh believed that Searfoss was capable of medium work and had limited depth perception. Tr. 456-57.

Absent a statement from a doctor opining that Searfoss was more limited than the ALJ found, it is difficult to conclude that the ALJ erred in her residual functional capacity determination. See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be."); Thompson v. Halter, 45 F. App'x 146, 148 (3d Cir. 2002) (citing Hutton v. Apfel, 175 F.3d 651 (8th Cir. 1999); Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983)) ("Most importantly, [no doctor] opined that [the claimant] could not work . . . while the absence of such a statement is not dispositive of the issue of disability, it is surely probative of non-disability.").

Additionally, the medical evidence does not support a conclusion that Searfoss is more limited than the ALJ concluded. Searfoss' 2007 MRI revealed only mild degenerative disc disease, while his 2011 x-ray demonstrated only mild degenerative joint disease. Tr. 220, 551. Searfoss did not receive any medical treatment for his back for more than two years, and told Dr. Vrabec that he was not visiting doctors because his back pain had "not been as bad" and was "under control with [his] TENS unit." Tr. 439.

Despite Searfoss' complaints of daily eye pressure, redness, and headaches, his treating physician Dr. Sparich routinely stated that none of these issues were present during examination. Tr. 314, 483, 492. Searfoss'

gait was consistently normal, and his range of motion was never restricted. Tr. 250, 252, 314, 338, 483, 492, 576, 586.

Searfoss is undoubtedly blind in his left eye, and suffers from glaucoma. Tr. 23. However, Searfoss maintained perfect 20/20 in his right eye, and his eye condition was stable. Tr. 273, 593. Searfoss admitted that he could compensate for his eye impairment enough to drive. Tr. 64, 78-79. Consequently, the totality of the evidence does not establish that Searfoss' physical impairments limited him more than the ALJ concluded, and the residual functional capacity determination is therefore supported by substantial evidence.

### B. The ALJ's Determination at Step Five

The ALJ determined at step four of the sequential evaluation process that Searfoss was unable to perform his past relevant work, and therefore moved on to step five. Tr. 30. At step five, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Searfoss could perform. Tr. 31. Specifically, the ALJ found that representative occupations included work as an office helper, a ticket seller, and a ticket taker. Id.

To support this conclusion, the ALJ relied upon the testimony of Ms. Kane, the impartial vocational expert who testified at Searfoss' administrative hearing. Tr. 31. During the administrative hearing, the ALJ posed a hypothetical question to Ms. Kane that accurately portrayed all of Searfoss' credibly established limitations. Tr. 109-10. Based upon that information, Ms. Kane testified that the individual would be able to perform

three jobs that exist in significant numbers in the regional economy: an office helper, a ticket taker, and a ticket seller. Tr. 110. Ms. Kane stated that her testimony was consistent with the Dictionary of Occupational Titles, except for the sit/stand option. Her testimony relating to that option was based upon her experience as a vocational expert. Tr. 112. Consequently, Ms. Kane's testimony constituted substantial evidence, and the ALJ did not err in finding that Searfoss was not disabled at step five. See, Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

### C. Newly Submitted Evidence

Included with Searfoss' response to the Commissioner's answer in this case was an MRI report. (Doc. 9). The MRI scan of Searfoss' lumbar spine revealed a disc herniation at the L4-5 level. The interpreting radiologist, Michael Steltz, M.D. opined that the herniation "could be impressing upon the right L5 nerve as well as the right L4 nerve." This MRI report was dated July 13, 2012, over five months after the ALJ issued her decision in this case. Tr. 32.

Remand for consideration of additional evidence is warranted "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Milano v. Comm'r of Soc. Sec., 152 F.App'x 166, 171 (3d Cir. 2005) (quoting 42 U.S.C. § 405(g)). Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990). "[A]n implicit

materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).

The evidence submitted by Searfoss did not exist at the time the ALJ issued her decision, and was not available to the ALJ. The MRI suggests that there may be nerve root impingement. Had this evidence been available to the ALJ, it could have affected the outcome of the ALJ's decision. However, this evidence is not material because it does not "relate to the time period for which benefits were denied," id., but rather relates to a period of time five months after the ALJ rendered her decision, and well over one year after Searfoss' date last insured. Consequently, this evidence suggests a "subsequent deterioration of [a] previously non-disabling condition," for which remand is not appropriate. Id.

### 4.     Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. §405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.

*s/ Malachy E. Mannion*
MALACHY E. MANNION
United States District Judge

Dated: September 30, 2014
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-2221-01.wpd